IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 17, 2022 Session

## LARRY MARK MANGUM v. LANEY CELESTE MANGUM

**Appeal from the Chancery Court for Hamblen County**
**No. 2016-CV-323     Douglas T. Jenkins, Chancellor**

_____

### No. E2021-00285-COA-R3-CV

_____

This appeal concerns a divorce. Larry Mark Mangum ("Husband") sued Laney Celeste Mangum ("Wife") for divorce in the Chancery Court for Hamblen County ("the Trial Court"). After a trial, the Trial Court entered its final judgment, which Wife appealed. In *Mangum v. Mangum*, No. E2018-00024-COA-R3-CV, 2019 WL 1787328 (Tenn. Ct. App. April 24, 2019) ("*Mangum* I"), we vacated the Trial Court's judgment except as to the divorce itself. We remanded with instructions for the Trial Court to make findings of fact and conclusions of law that consider all of the relevant and applicable statutory factors guiding child custody and property division matters, respectively. On remand, the Trial Court entered a new final judgment in light of our Opinion in *Mangum* I. Wife appeals, arguing that the Trial Court erred in fashioning the permanent parenting plan concerning the parties' two minor sons ("the Children") as well as in its classification, valuation, and division of the parties' property. Husband raises the separate issue of whether this appeal is frivolous. We find that the Trial Court, in considering all of the relevant statutory factors, complied with our instructions on remand. We find, *inter alia*, that the evidence does not preponderate against the Trial Court's findings with respect to its application of the statutory factors. However, while the Trial Court expressed a clear intent to award Wife more than half of the marital estate, its written order in fact awards Husband significantly more than half of the marital estate because of a mathematical error. Therefore, in order to effectuate the Trial Court's clearly expressed intent and to correct what we discern to be mathematical error, we modify the Trial Court's judgment to reduce Husband's share of the marital estate by $30,000 and increase Wife's share by the same amount. Wife's appeal is not frivolous, and we decline to award either side attorney's fees or expenses. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Betsy Stibler, Morristown, Tennessee, for the appellant, Laney Celeste Mangum.

Cameron Beier, Morristown, Tennessee, for the appellee, Larry Mark Mangum.

**OPINION**

**Background**

This is a divorce case that has been appealed to this Court once before. In July 2016, Husband sued Wife for divorce in the Trial Court. In December 2017, after a trial, the Trial Court entered its final judgment. The Trial Court attempted to award Wife more than half of the marital estate. The Trial Court designated Husband as the primary residential parent of the Children while granting the parties equal parenting time. Wife appealed. In *Mangum* I, we vacated the Trial Court's judgment except as to the divorce itself and remanded with instructions for the Trial Court to make findings of fact and conclusions of law that consider all of the relevant and applicable statutory factors. In *Mangum* I, we set out the background of this case as follows, in part:

> This divorce involves a tumultuous marriage of six years between professional parents who both worked full-time. The couple have two young sons (ages 4 and 6 at the time of the trial).
>
> When the parties began their relationship, Laney Celeste Mangum ("Wife") was 30 years old and a pharmacist. Larry Mark Mangum ("Husband") was 55 years old and the sole owner of an established veterinary practice in Hamblen County. Husband also owned several farms with cattle and livestock. Additionally, he owned real property and various assets related to his cattle business. Husband's gross income for 2016 was $366,209; Wife's income for the same year was $134,063.
>
> In June 2010, before the couple married, Wife discovered that she was pregnant. The parties' first child, Samuel, was born on January 29, 2011. In order that Wife could continue working as a pharmacist after the birth of her son, her mother retired from her job to become a full-time caretaker for the child. In December of that year, just before Samuel's birth, Husband purchased a farmhouse and acreage at 1735 Needmore Road, Whitesburg,

-2-

Tennessee ("the Needmore Road property"). The Needmore Road property was purchased by Husband as sole owner, although Wife notes that it was refinanced with both Husband's and Wife's financial information. While waiting on remodeling of the farmhouse, the parties and Samuel lived in a property owned by Wife's parents at 1816 Leia Drive in Morristown ("the Leia Drive property").

The parties were married on November 26, 2011. This was the first marriage for Wife and the second marriage for Husband. Less than a year later, on August 6, 2012, Husband was found guilty in federal district court of the felony of structuring funds to avoid filling out a currency transaction report. He was ordered to serve five years on probation, perform 350 hours of community service, pay a $50,000 fine, and serve two 30-day periods of intermittent confinement. The following year, the parties' second child, John Mark, was born on April 26, 2013.

***

Counselor, Nan Buturff, a licensed clinical social worker, testified at trial that she had met with the children and observed their aggressive behavior toward Wife. She discussed the differing disciplinary styles of the parents and the Mother's use of time out versus Father's corporal discipline. Ms. Buturff related that she does not believe in corporal punishment; in her view, it is ineffective, does not teach respect, and it only humiliates and angers a child. Ms. Buturff opined that "corporal punishment needs to be a thing of the past" in regard to these children. She admitted that she was unaware of Wife's psychiatric history, if any.

Husband testified that Wife worked all the time, stayed in bed when she was home, and did not help much with the children. According to Husband, he hired maids, cooks, and caretakers to help him attend to the boys. He stated that he spends his mornings with the children and takes them with him to the clinic. Husband further related that he had raised his two older children from his first marriage in the same environment. He noted that one of them is a veterinarian and the other is a teacher.

Husband opined that Wife's parents were a big problem in the marriage, always wanting to take control of the children. He observed that Wife loves her sons but cannot take care of them. Rather, Wife relinquishes the care of the children to her parents and her friend, Lauren Rice.

Wife testified that the children were often aggressive, violent, and out of control when they were with her. In addition, Wife alleged domestic abuse. According to Wife, Husband hit her in October 2015 and January 2016.

***

Husband responded that he did not abuse Wife and that the pictures she introduced showing bruises on her thigh and arm occurred in a 2015 fall. According to Husband, Wife squirted a drink in his face as he was lying in bed asleep, smacked him on the head with the carton, and then threw a porcelain platter at him. He claimed that when he jumped up, Wife ran into the bedroom, tripping over a chair and hitting the vanity table with her side. Husband asserted that he did not touch Wife.

***

Wife and her mother alleged injuries to the children during the time that they were under the supervision of Husband or Husband's family members acting as caretakers. When Husband worked, the children were cared for by his family or taken to the clinic where he and his staff watched them. Wife further alleged that Husband's sister had abused the oldest son by hitting him with a switch. During questioning about her abuse allegations toward the children, Wife testified:

> A. Yeah. I mean, it's like when they've come home it's like they're constant ... there's constant injuries and then like the motorcycle burn and John Mark had bruises on his back too from falling off the pony. (Witness paused)
> Court: Well that's pretty normal boy stuff I think, you know, based on my experience. So, you know, if you've got some evidence that somebody's abusing them or anything, you know then ... and I'm talking more than just giving them a good whipping. I'm talking about some sort of abuse. I'll listen to it.

***

In a final judgment rendered on December 7, 2017, the trial court ordered the parties divorced and approved a parenting plan that granted the parties equal co-parenting time with joint decision making and Husband as the primary residential parent. The trial court awarded Wife all of her interest in her 401(k) and her personal bank account. She was allowed to retain the $9,700 in cash of Husband's property and was awarded all interest in her personal property listed. Husband was awarded all interest in the marital residence, his IRA, his business account, personal accounts, livestock, and an antique car. Husband was held solely responsible for the line of credit. Additionally, he was awarded as his sole property the remaining real property, personal property, and farm equipment. Husband continued to live at the Needmore Road property, which was awarded to Husband as his separate property, although the court did award Wife $25,000 for her share of the increased value as a result of improvements. In the trial court's memorandum opinion, the court "believe[d] that the increase in value or the increase to the marital estate during the marriage on the marital home is the equivalent of one hundred thousand dollars ($100,000.00)." "The court found that 'the Wife's share of the cattle is twenty-five thousand dollars ($25,000.00)." The court opined that he believed he was awarding Wife a bit more than 50% of the marital estate:

> I find that it's just a wash. There were some things accrued or increased during the marriage but they were sort of accrued on both sides so the Court doesn't believe that it would be equitable for any money to change hands. The Court's calling it a wash. And that favors the Wife because she gets to retain her sizable 401K.
>
> ***
>
> I believe, the way I think about the numbers, that I have favored the Mother a little bit in the number and it's probably not up to sixty forty (60/40) but it's more that she gets more than fifty percent (50%) I guess of whatever accrued during the marriage because I'm just knocking her whole retirement fund off to her. But if you look at it and you become convinced that I've given her less than fifty percent some way or other then bring it back before the court in a Motion if you don't mind and let me at least hear what you're thinking, okay.

As to the parenting plan, the court observed that it was "troubled ... because nothing I try to do for you guys seems to work." The court continued:

I think Mom there's a lot of testimony from friends of yours and insinuating on the record that you were planning on moving somewhere. And if that's what is best for you ... the Court absolutely is not telling someone they can or cannot move. The father is anchored. I know the kids will have a roof over their head there. And for that reason the Court is choosing to make the Father the [primary] residential parent. But the main reason I'm doing that is because of this indication that you may move ....

But I am going to try to split the time with you two as close to equal as I can get.

***

Mr. Stambaugh: ... [A]re we talking a four/three (4/3), three/four (3/4) that would alternate a fifty/fifty (50/50) schedule like Nan Buturff suggested in her testimony?
Court: Yeah that's what I want to do. Yeah.

***

Court: ... I'm making the Father the primary custodian because if she decides to move somewhere I want her to have to give him the notice and I want the case to have to come back before me and me hear it again.... But she testified from the witness stand that she had no immediate plans to go anywhere although maybe in her heart of hearts she'd like to ....

*Mangum* I, 2019 WL 1787328, at *1-4, *6-7.

In *Mangum* I, we vacated the Trial Court's judgment except for the divorce and remanded for the Trial Court to make findings that consider the statutory factors applicable to child custody determinations and property divisions, respectively:

As noted by Wife, in naming Husband primary residential parent, the only factor that the trial court appeared to consider was the stable environment offered by Husband in the marital home. The court did not enumerate or discuss the statutory factors as to the education, character, and experience of the parents, their economic circumstances and employment schedules, and their conduct. There is no discussion of the "best interests of the children." The trial court did not mention or discuss the children's ages, habits, mental and emotional make up; the relative location of the parents' residences; the relationships between the children, caregivers, and family

-6-

members; or the relationships between the parents and children. It made virtually no findings of fact regarding the abuse allegations but designated Husband as the primary residential parent. We must remand for the court to make appropriate findings as to the abuse issue in addition to all other relevant and appropriate statutory factors. Consistent with our standard of review, this is a determination more appropriately made by the trial court. All other matters raised related to the permanent parenting plan are pretermitted.

***

It is apparent to this court that the trial court struggled mightily with these parties and the case. In the absence of sufficient fact findings reflecting the property valuations, it is difficult for us to discern the rationale behind the property division and whether it is equitable. During the reconsideration of this case, the trial court is further directed to make specific fact findings as to the property issues pursuant to the factors listed in 36-4-121(c).

*Mangum* I, 2019 WL 1787328, at \*14, \*17.

In October 2019, the Trial Court entered an order on remand applying the pertinent statutory factors in fashioning a permanent parenting plan for the Children. The Trial Court found, in part:

If the undersigned understands the Opinion correctly, the Court of Appeals suggested that the [T]rial Court should have considered the sixteen (16) factors formerly found at T.C.A. 36-6-404(b) in formulating a Permanent Parenting Plan. The Court of Appeals vacated the [T]rial Court's order, in part, for failure to make findings in accordance with that statute. However, the version of the statute cited in the Court of Appeal's Opinion was no longer in effect in October 2017 when this case was tried. It appears to have been amended by deleting the sixteen (16) factors as of July 2014. Consequently, the Court did not expressly consider the 404(b) factors. The Court finds that the statutory factors in T.C.A. 36-6-106(a) for determining "best interest" are the law of this case. These factors were previously considered in adopting the parties' agreement which was announced in open court and at the conclusion of the trial. These are the factors routinely used by the Court to formulate parenting plans where no agreement can be reached. In obedience to the Court of Appeals and pursuant to T.R.C.P. Rule 52, the Court memorializes the following findings and conclusions:
Findings:

(1) This factor [concerning the strength of relationship] weighs heavily in favor of the Father being the primary custodian of these children;

(2) This factor [concerning the facilitation of a relationship with both parents] weighs evenly between the parties, perhaps slightly in favor of the Father as the Father was willing, during the pendency of the divorce, to allow the Mother to go on a cruise with the children and his extended family and did other things the Court considered as efforts to maintain the children's relationship with their Mother. The Mother, on the other hand, will hopefully do better in the future at fostering a relationship between the Father and his children when they are in her care;

(3) The Court finds that both parties have been to the parenting classes;

(4) The Court finds this factor [concerning the provision of care] to be equal between the parents;

(5) Based on the proof the Court heard at trial, and several preliminary hearings, (where the Court had a great deal of trouble of getting a temporary parenting plan down that did not put the children in the middle of these parties' frequent and bitter disputes), this factor [concerning the degree to which one parent has been primary caregiver] weighs in favor of the Father;

(6) The Court believes that it is in the best interest of these minor children to have a close and loving relationship with their Mother instead of being kept away from her. The same is true of Father. Mother and Father cannot get along with each other, but the Court finds that their "bad blood" should not carry over to the Parenting Plan. The children need and love both parents;

(7) The Court finds that the children have different personalities, with different strengths and weaknesses, but there are no conditions that would preclude shared and equal parenting;

(8) This factor [concerning the moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child] weighs in favor of the Father. Mother has some health issues and medications that adversely affect her parenting. Father does not. The Mother has a history of somewhat irrational conduct, but the children love her very much. The Mother's expert witness sanctioned equal time parenting as long as the children were not away from one parent for more than four days. The Court does not credit everything Mother's expert said, particularly as to discipline. But the Mother's expert gave a good history of interactions with the parents and children that seemed fair. Mother has trouble controlling the children. Father does not;

(9) This factor [concerning a child's relationships and physical surroundings] weighs in favor of the Father. The stability of the Father and

-8-

his extended family unit, as well as his successful parenting of two adult daughters impressed the Court and significantly affects the Court's decision to name the Father primary residential parent. When the children are in Father's care, they are surrounded by extended family, grandparents, and aunts. The Court finds specifically that this is very much in the best interest of the minor children. The Court also finds that a relationship with the Mother's extended family is in the best interest of the minor children;

(10) This [factor concerning continuity] is equally applicable to both parties. However, the Mother at times has insinuated that she is going to move. The Mother's sometimes irrational behavior is not as worrisome to the Court because the Father is close at hand and has the ability to get the children at a moment's notice. However, if the Mother were to take the children and move to where the Father did not have almost instant access to the children, the Court fears that such a move would be detrimental to the children;

(11) The Court finds that both parents abused each other; however, that does not deter the Court's determination for equal time. Technically, under a strict reading of the law, both Mother and Father could be labelled "Domestic Abuse Victims" (See T.C.A. 36-6-406(b) and T.C.A. 36-3-601). That being said, the domestic violence issue (T.C.A. 36-6-406) was waived at trial when the parties stood up in open court and agreed to an equal time parenting plan after much of the proof was in. No party or lawyer suggested during the trial that either parent's parenting time should be limited. T.C.A. 36-6-406 was not mentioned orally or in any pleading before the Court that the Court can recall. Nor did the Mother submit a proposed parenting plan containing time limitations for the father. The Mother, while on the witness stand, denied that she wanted Father's parenting time limited. The Court thinks that it should be entitled to take her at her word on that without making any further finding. It is unclear when Mother changed her mind about limiting the Father's parenting time, but it was definitely subsequent to the conclusion of this matter in the trial court. The Court is of the opinion that this issue is waivable, and was expressly waived by both Mother *and* Father due to their failure to assert their rights in the trial court. The matter must have first emerged on appeal, because it was not an issue at trial.

However, if the matter is again appealed, and if the Court of Appeals disagrees and finds that the issue was not waived, the Court hereby expressly considers the domestic violence of *both* of the parents with respect to their parenting time. The record is full of mostly minor acts of emotional and physical abuse perpetrated by both parents against the other. The Court did not — and never would — "ignore" domestic violence. But what is the Court to do in a case such as this? The Court finds that the instances of domestic

violence between the parties were typically one provoking the other followed by a reaction from the provoked party against the other. The Court most certainly does not condone the parties' conduct toward one another; however, the Court does not view this as the type of behaviors that should be used to limit the parenting time of either parent. Further, the Court finds that neither party presently *resides* with an abuser as required by T.C.A. 36-6-406(b) for limitation of parenting time. They may very well have both *formerly* resided with an abuser (when they lived with each other), but neither presently does. The technical record supports a finding that they separated from each other on July 1, 2016. The Court finds that these parties need to be divorced and living apart since they cannot seem to get along with each other. The few times that their fighting has erupted into physical violence, in the Court's opinion, the combat was mutual. In the quantum of credibility, the Court finds Father more credible than Mother on this issue — and this after repeatedly observing the demeanor of both parties in multiple hearings. The Court finds that neither party's parenting time should be limited due to their actions against the other. The Court does not find that either parent's participation in the children's lives will have an adverse effect on the children. T.C.A. 36-6-406 should not be used to limit the parenting time of either parent. The Court impliedly found previously and expressly finds presently that the opposite is true. To limit the parenting time of either parent would be detrimental to the children.

Alternatively, if T.C.A. 36-6-406 does, in fact, require either or both parent's time to be limited in this case, then the Court limits Father's time to 50 percent and limits Mother's time to 50 percent to satisfy the requirement.

The Court also observes that there is some discrepancy in T.C.A. 36-6-10[6](a)(11) and T.C.A. 36-6-406. In the first, "abuse" is simply a factor to be considered, but in the latter "abuse" seems to mandate a limitation of parenting time for the abuser. This Court cannot resolve those differences;

(12) This factor [concerning other persons in the home] favors Father. The Court questions the Mother's rationale in delegating many of her parenting responsibilities to her parents and former college roommate/friend. The Court believes she has made the statements attributed to her by witnesses where she expressed regret that she was saddled with parenting responsibilities. But she certainly said these things in a weak or despairing moment, and the Court does not really believe she meant it in her heart of hearts. Mother's delegation of parenting responsibilities to her parents and friend does not seem to be particularly repugnant to the children's best interest, so the Court is not using it to decrease her time. These are young children that adore both parents and both extended families — and this part of the proceeding is about the children — not the parents;

(13) This is not applicable as the Court did not hear the preference of the children;

(14) The parents both live and are employed locally in Hamblen County; however, Mother at times has insinuated that she is going to move. The Court does not see any reason to do anything here other than shared and equal parenting until and if the move is made;

(15) As the Court tried - in an inarticulate way - to explain when uttering its prior ruling on the case, the evidence favors Father being primary residential parent in the Parenting Plan. The Court has no doubt the kids love the Mother. She in turn loves them. But it appears to the Court that at times she is fragile; is barely able to take care of herself; and needs help parenting.

With respect to the complaint about a "Christian" counselor, the Court believes that it is within the discretion of the Court to require a faith-based counselor. The Court does not read the Court of Appeals' Opinion as precluding a faith-based counselor. The Court sees no basis to preclude the children from seeing a faith-based counselor since the Father indicated in court that was the only type of counselor to which he would agree.

\*\*\*

Conclusion:

For the reasons stated above and previously in open Court, the Court hereby adopts the Permanent Parenting Plan entered on December 7, 2017, and the same is hereby ORDERED.

In February 2021, the Trial Court entered its final judgment in which it addressed the property division. The Trial Court summarized its division of the marital estate as follows:

| Wife Receives | Husband Receives |
|---|---|
| Her IRA $259,000 | $100,000 appreciation in marital home |
| Cash on hand: $3,000 | His IRA: $43,000 in appreciation |
| Adjustment Verizon/cash: $5,885 | Business Account: $15,000 |
| | Cattle: $25,000 (marital interest) |
| Total: $265,885[1] | Total: $183,000 |

(Footnote added).

---

[1] We note that this column does not add up. The sum should be $267,885.

Wife was further awarded various items of personal property. The Trial Court attached to its final judgment a transcript of its oral ruling from the September 2020 hearing at which it explained its division of the marital estate. In its oral ruling, the Trial Court stated, in part:

So on Pages 7 and 8 of the previous Ruling...I'm obviously readopting everything previously found but also in addition, with respect to the real estate, to be clear, the Court said, "I find that *all* real estate is premarital and is Mr. Mangum's separate property." I don't know how much more I need to say about that. The proof I think was clear, it was owned before the marriage. So the only property, real property that the Court saw that had appreciated in value was this house that they lived in, the marital house. And that did, based on their efforts to fix it up and live in it accrue some additional value. And the Court previously found, I think, that that was one hundred thousand dollars ($100,000.00). The Court still thinks that. And I don't think any further findings are required on that except to say that the Wife claimed that her signature on Deed of Trust changed it all over into marital property and that is everything secured by that Deed of Trust. And it's an exhibit in the original case. And the Court doesn't know the exact exhibit number. But the Wife says that her signature on a certain Deed of Trust that's in the record changed everything secured by that Deed of Trust over to marital property. The Court specifically finds that it did not. She was not bound on the loan. She didn't make any of the payments. She didn't contribute to any of the income that made the payments. And therefore, the Court rejects that theory. And again finds all real property...now I'm not listing each parcel individually because Mr. Mangum owns a lot of property and the Court, you know, heard a lot of proof on it and it's in the record. But I don't see how much more specific I need to be than to say "all real property."

\*\*\*

Now with respect to the Parties' retirement assets, the Wife's 401K was two hundred and fifty-nine thousand dollars ($259,000.00), give or take a little at the time of the divorce. I found that that was all marital because I think that that's in keeping with the proof that I heard. And so that's an asset that has to be divided.

\*\*\*

And there was a previous Judgment where I said in previous Orders before the final day of court that the Wife owed the Husband ninety-seven hundred

-12-

dollars ($9,700.00) for some cash that was taken. And so that's the Court's Ruling with respect to moneys on-hand.

***

I also found that the Wife's assertion that the Husband had bought during the marriage a cow worth two hundred and fifty thousand dollars ($250,000.00), The Court did not credit that testimony and still doesn't. The Court doesn't find that there's a cow in the marital estate worth two hundred and fifty thousand dollars ($250,000.00). And that the cattle are probably worth more what the Husband testified to at the divorce, which was about nine hundred dollars ($900.00) a piece. And I found that the marital interest that the Wife held...or the Parties held as marital property in the cattle was approximately twenty-five thousand dollars ($25,000.00). And again, I'm not sure exactly what more I can say about that. I've considered her testimony and I've considered his testimony and that is the way I resolved the testimony, to find that there are twenty-five thousand dollars ($25,000.00) worth of marital cattle. So I have not itemized that in any particular way. I've not tried to make a list of every cow I think these people own. I've taken the cattle in gross and I find that her interest is twenty-five thousand dollars ($25,000.00).

***

But when it comes to the rest of this property settlement I again, and I said this on the record last time and I guess it was ambiguous and hard to understand so I'm trying to say it again a little clearer. But this settlement I'm calling a wash. Technically the Wife owes the Husband about thirty...or somewhere between thirty ($30,000.00) and fifty thousand dollars ($50,000.00). And I'm saying that she doesn't have to pay it. I'm saying that this is a wash. She doesn't have to pay that. I am favoring her in this settlement probably as much as sixty/forty (60/40) and frankly it could be a little bit more.

Now I guess the Court of Appeals maybe wanted me to say why I did that based on these factors and so let me go down through here and do this based on the factors one at a time and maybe they will understand my rationale and I offer them my apologies for not being specific enough last time.

***

-13-

Bottom of Page 24 is the Court's remand there. There they're still at *36-4-121* but they're at *(c)(1)*. The duration of the marriage. This wasn't all that lengthy of a marriage but it was a fairly lengthy relationship and the Parties had two (2) children and they've had a lot of trouble since they got married but they apparently got along pretty good at least in the early parts of it. But the Court, even though the length, the actual years of this marriage may not weigh in favor of doing this the way that I've done it there was fruit of the marriage, these two (2) little precious boys. And these Parties went into the marriage with their eyes wide open. They'd had a pretty lengthy relationship before they got married. So the Court's using that factor to do what I did in the Wife's favor.

*Number (2)*. The age, physical and mental health, vocation skills, employability, earning capacity, estate, financial liabilities, financial needs of the Parties. The Husband is very wealthy, although he owes quite a bit of money. He's got a lot of cash flow, a lot of premarital property. His net worth is extensive. The Wife's age, physical and mental health is not lacking such that I should favor her in any way I don't think, but she is not nearly as wealthy as the Husband and she's raising his children so in fairness I think I ought to favor her in this. I guess, based mainly on the Husband's wealth.

*Number (3)*. Tangible or intangible contribution by one Party to the education, training or increased earning power of the other Party. If I heard proof on that I don't remember it. But the Wife is a pharmacist to my understanding and she's gainfully employed and making a good living and not dependent upon the Husband nor his income. So that one, *Number (3)* is probably a wash to be honest with you.

*Number (4)*. The relative ability of each Party for future acquisition of capital assets and income. I'd say the Husband's is much greater than the Wife's and that's why I'm favoring her.

The contribution of each Party to the acquisition, preservation, appreciation, depreciation, or dissipation of the marital or separate property including the contribution of a Party to the marriage as a homemaker, wage-earner, parent with the contribution of a Party as a homemaker or wage-earner to be given the same weight if each Party had fulfilled its role. Both Parties in this marriage were "breadwinners", for lack of a better way to say it. And Wife, I find, contributed her share during the marriage and for that reason the Court's favoring her somewhat in the settlement. But again, it's not necessarily based on that. It's based on the Husband's other wealth and assets and earning capacity, which is much greater than hers.

For purposes of Section *(c)(5)*. Dissipation of assets. Which is basically wasteful spending. Husband may have said Wife did that but I

-14-

didn't make any specific findings on it and still don't. So I don't think that prevents a division such as the one that I formulated.

The value of the separate property of each Party. Obviously, I've already talked about that. That weighs greatly in favor of what I'm doing in favor of the Wife.

*Number (7)*. The estate of each Party at the time of the marriage. I think the proof was Wife didn't have much property at the time of the marriage. Husband had a substantial amount, which most of which he's retaining. Therefore, I think that one, in my mind anyways, favors doing what I did.

Let's see, the economic circumstances of each Party at the time the division of property is to become effective. I think the economic circumstances are better for the Wife than they were at the time of the marriage but still she's somewhat disadvantaged in that her income and assets are less than Husband's so I think that supports what I have done.

*Number (9)*. The tax consequences to each Party. I didn't take any proof on that that I heard, or the foreseeable [sale] of assets or the [sale] and expenses of assets. That...I'm not really considering *Number (9)* here.

*Number (10)*. The amount of Social Security benefits. I didn't hear much about that from either one of them I don't think.

And it says such other factors that are necessary to consider the equities between the Parties. And I think I said several times the thing that clinched it for me that I needed to favor the Wife was Husband's wealth, assets and earning capacity are somewhat greater than the Wife's. So the Court believes what it did is fair and equitable to both Parties.

Wife timely appealed to this Court.

### Discussion

Although not stated exactly as such, Wife raises the following issues on appeal: 1) whether the Trial Court erred in fashioning the permanent parenting plan; 2) whether the Trial Court erred in its classification, valuation, and division of property; and 3) whether Wife is entitled to an award of attorney's fees and litigation expenses on appeal. Husband raises the separate issue of whether this appeal is frivolous.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no

presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). To the extent that the issues on appeal implicate the abuse of discretion standard of review, "[a] court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020) (internal quotation marks omitted) (quoting *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020)).

We first address whether the Trial Court erred in fashioning the permanent parenting plan. Our Supreme Court has explained that trial courts have considerable discretion in deciding the details of parenting arrangements, stating:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey–Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the

-16-

trial judge.' " *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

*Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). The following statutory factors applied to the Trial Court's decision herein on custody:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;
(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;
(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;
(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (West July 1, 2016 to June 30, 2021).

Wife argues that the Trial Court erred in its analysis with respect to factors (1), (8), and (14). Specifically, Wife points to, among other things, her testimony that Husband was not an active father; that the Children suffered injuries in Husband's care; and that licensed clinical social worker Nan Buturff ("Buturff") had concerns about Husband's use of corporal punishment on the Children. Wife argues further that the Trial Court failed to consider evidence of Husband's domestic violence against her. She states that Husband's parenting time should be restricted based upon his history of domestic violence. In addition, Wife asserts that the Trial Court inappropriately concluded from Wife's testimony that she wanted to move out of her parent's house and out of the jurisdiction simply because she expressed a desire to have a place of her own. In a nutshell, Wife

contends that the evidence preponderates against the Trial Court's factual findings. For his part, Husband argues that Wife failed to timely submit a proposed permanent parenting plan below; that she has therefore waived her challenges to the permanent parenting plan; and that, in any event, the Trial Court considered each relevant statutory factor and its resulting custody determination is supported by a preponderance of the evidence. Husband further notes that the Trial Court found him more credible than Wife.

Initially, we disagree with Husband to the extent that he argues Wife waived any issues concerning the permanent parenting plan, particularly with regard to the issue of domestic violence. As we explained in *Mangum* I, "[t]he trial court is required to consider evidence of physical or emotional abuse against the other parent in determining the custody and parenting schedule for the children." 2019 WL 1787328, at *14 (citing *Burden v. Burden*, 250 S.W.3d 899, 913 (Tenn. Ct. App. 2007)). Here, we specifically instructed the Trial Court to consider the issue of abuse on remand as part of its determination of a custody arrangement in the Children's best interest. *Id*. The Trial Court, in keeping with our instructions, did so. The Trial Court found that "both parents abused each other[.]" The Trial Court found further that "[t]he record is full of mostly minor acts of emotional and physical abuse perpetrated by both parents against the other"; that "the Court finds that neither party presently *resides* with an abuser as required by T.C.A. 36-6-406(b) for limitation of parenting time"; and that "[t]he Court does not find that either parent's participation in the children's lives will have an adverse effect on the children." In addition, the Trial Court found Husband to be "more credible than [Wife] on this issue — and this after repeatedly observing the demeanor of both parties in multiple hearings." The Trial Court thus fully addressed the issue of abuse as instructed by this Court. In essence, the Trial Court found no basis to restrict Husband's parenting time with the Children as it found that both Husband and Wife had committed violence against one another. The Trial Court also found specifically that the parents' acts of violence against one another, while regrettable, did not warrant a reduction of parenting time for either parent as both parents had engaged in the conduct. The evidence does not preponderate against these findings.

At oral argument, Wife cited Husband's criminal background as grounds for disbelieving his testimony. Husband was found guilty in federal court of structuring funds to avoid filling out a currency transaction report. Wife says this crime bears on Husband's honesty. While Husband's conviction of a crime involving fraud is indeed a consideration relevant to his credibility, Wife has cited no law to the effect that a trial court is prohibited from crediting the testimony of a witness previously convicted of such a crime. We do not find that Husband's criminal conviction for structuring funds in itself constitutes clear and convincing evidence sufficient to overturn the Trial Court's credibility assessment in his favor. Furthermore, the Trial Court's assessment of Husband's credibility did not occur in a vacuum, or between Husband and the ideal witness. The Trial Court also saw and heard

Wife testify. Even if Husband's credibility was less than perfect, the Trial Court nevertheless found him more credible than Wife, as was its prerogative.

With respect to Wife's other points regarding the Trial Court's application of the statutory factors in reaching a custody determination, it is plain that the Trial Court considered Buturff's testimony but did not credit it entirely. With regard to the Trial Court's consideration of Wife potentially moving to a new residence, we find that this was a fair interpretation of Wife's testimony and a legitimate scenario for the Trial Court to consider. We note further the Trial Court's findings that "[Wife] has a history of somewhat irrational conduct" and "it appears to the Court that at times she is fragile; is barely able to take care of herself; and needs help parenting." On remand, the Trial Court considered each statutory factor under Tenn. Code Ann. § 36-6-106(a) and made findings as to the Children's best interest, fully compliant with our instructions. The evidence does not preponderate against any of the Trial Court's factual findings relative to this issue. The Trial Court neither applied an incorrect legal standard, reached an illogical or unreasonable decision, nor based its decision on a clearly erroneous assessment of the evidence. In short, the Trial Court did not abuse its discretion. We affirm the Trial Court in its fashioning of the permanent parenting plan.

We next address whether the Trial Court erred in its classification, valuation, and division of property. The division of the parties' property begins with the identification and classification of all property interests. *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007). All property should be classified as either marital or separate property prior to distribution of the marital estate because the trial court does not have the authority to make an equitable distribution of separate property. *Id.* The classification of property during a divorce proceeding as either marital or separate property is a question of fact to be determined by the trial court upon consideration of all relevant circumstances. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009). Generally, unless proven otherwise, property acquired by either spouse during the marriage is presumed to be marital property, while property acquired by either party prior to the marriage is presumed to be separate property. *Trezevant v. Trezevant*, 568 S.W.3d 595, 615 (Tenn. Ct. App. 2018); *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007). If a spouse seeks to have the other spouse's separate property classified as marital property, he or she bears the burden of proving that such property has become marital property as defined in Tenn. Code Ann. § 36-4-121(b)(1). *Keyt*, 244 S.W.3d at 328. Similarly, a spouse seeking to have property acquired during the marriage deemed as separate property has the burden of proving the asset is separate property, which can be proven by the types of evidence found in Tenn. Code Ann. § 36-4-121(b)(2)(B)-(F). *Owens*, 241 S.W.3d at 485-86. Courts must look to Tenn. Code Ann. § 36-4-121 when classifying property as marital or separate. Tenn. Code Ann. § 36-4-121(b) (West July 1, 2015 to June 30, 2017) provided, in pertinent part, as follows:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date….

(B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation;

(ii) "Marital property" includes the value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefit rights accrued as a result of employment during the marriage;

(iii) The account balance, accrued benefit, or other value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be "separate property." In determining appreciation for purposes of this subdivision (b)(1)(B)(iii), the court shall utilize any reasonable method of accounting to attribute postmarital appreciation to the value of the premarital benefits, even though contributions have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage; provided, however, the contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions, would be "marital property." When determining appreciation pursuant to this subdivision (b)(1)(B)(iii), the concepts of commingling and transmutation shall not apply;

(iv) Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire separate assets of the employee spouse shall be deemed to have come from the separate portion of the account, up to the total of the separate portion. Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire marital assets shall be deemed to have come from the marital portion of the account, up to the total of the marital portion;

***

(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine;

\*\*\*

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986, compiled in 26 U.S.C., as amended;

(B) Property acquired in exchange for property acquired before the marriage;

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); [and]

(D) Property acquired by a spouse at any time by gift, bequest, devise or descent….

Beyond the classification of assets, Wife's issue also implicates the Trial Court's valuation of assets. In *Neamtu v. Neamtu*, No. M2008-00160-COA-R3-CV, 2009 WL 152540 (Tenn. Ct. App. Jan. 21, 2009), *no appl. perm. appeal filed*, this Court discussed our standard of review with respect to the valuation of marital assets. We stated:

> Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at \*11 (Tenn. Ct. App. May 13, 2003). The parties have the burden to provide competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values presented. *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997). Decisions regarding the value of marital property are questions of fact, *Kinard*, 986 S.W.2d at 231; thus, they are not second-guessed on appeal unless they are not supported by a preponderance of the evidence. [*Smith v.*] *Smith*, 93 S.W.3d [871,] 875 [(Tenn. Ct. App. 2002)].

*Neamtu*, 2009 WL 152540, at \*4. Finally, Wife challenges the Trial Court's distribution of the marital estate. In *Larsen-Ball v. Ball*, 301 S.W.3d 228 (Tenn. 2010), the Tennessee Supreme Court stated as follows with regard to the division of a marital estate:

> After classifying the divorcing parties' assets as either separate or marital, the trial court must divide the marital estate equitably by weighing the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c). We give great weight to the trial court's division of marital property and " 'are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.' " *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)).
>
> Tennessee Code Annotated section 36-4-121(c) provides that in making an equitable division of marital property, the trial court shall consider all relevant factors. Because trial courts have broad discretion in dividing the marital estate, the division of marital property is not a mechanical process. *Flannary* [*v. Flannary*]*,* 121 S.W.3d [647,] 650 [(Tenn. 2003)]. Rather, the trial court should weigh the most relevant factors in light of the facts of each case. *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003). We review the trial court's findings of fact de novo with a presumption of correctness and honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008). When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact. *Keyt*, 244 S.W.3d at 327.

*Larsen-Ball*, 301 S.W.3d at 234-35 (footnote omitted). Tenn. Code Ann. § 36-4-121(c) provided:

> (c) In making equitable division of marital property, the court shall consider all relevant factors including:
> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (West July 1, 2015 to June 30, 2017).

In her statement of the issues, Wife identifies six specific areas in which she contends that the Trial Court erred in classifying, valuing, and dividing the parties' property, to wit: (1) that the Trial Court erred in finding that all of the real estate was premarital property and awarding it to Husband; (2) that the Trial Court erred in finding that all of Wife's 401(k) was marital property and that Husband's 401(k) increased in value by $43,000 during the marriage; (3) that the Trial Court erroneously awarded Husband $9,700 without an appropriate basis after having previously awarded the same amount to Wife; (4) that the Trial Court failed to distribute the increased value of Husband's clinic; (5) that the Trial Court erred in finding that all of the cattle was premarital property and valuing the marital interest in the cattle at $25,000; and (6) that the Trial Court erred in finding that all of the farm equipment was premarital property. In her brief, Wife states:

As a result of the Trial Court's erroneous classification of marital property, lack of valuation, and marital property division, Wife leaves this marriage with no real property, liquid assets, or personal property beyond miscellaneous personal effects. Wife was awarded her 401(k) account, the

-24-

majority of which was accrued prior to the marriage, while Husband was awarded all of his purported separate property, including real estate, farm equipment, and livestock, which he valued at well over $8,000,000, and the majority of the marital property. Wife is left in a much worse position than she was at the beginning of a six (6) year marriage to an extremely affluent husband.

In response, Husband argues that Wife's purported valuations are inadmissible. Husband states that Wife is not a record owner of any of the deeds to the real estate, and that Husband owned the real estate as sole owner prior to the parties' marriage. Husband contends that Wife fails to point to any finding that the Trial Court classified all of Wife's 401(k) as marital property as opposed to only a $127,000 increase agreed upon by the parties. Husband also argues that the $9,700 awarded to him by the Trial Court was a credit for $9,700 Wife had taken from him out of his jacket; that Wife points to no evidence of an increase in the value of Husband's clinic; regarding the cattle, that the Trial Court chose a figure in keeping with the evidence presented by both parties; and that the farm equipment was Husband's separate property and was, in any case, encumbered by a home equity line of credit (HELOC) loan to the full extent of its value.[2]

Although Wife frames her six sub-issues in a sequential format, she does not rigidly adhere to that order in the body of her brief. Setting aside for now the question of Wife's 401(k), we begin by addressing Wife's other arguments concerning the classification of property. Wife states that the Trial Court erred in finding that the real estate—notably, the marital home—was Husband's premarital property since both Husband and Wife participated in renovating it. Wife says this is "classic transmutation." However, she cites to no law regarding the doctrine of transmutation. She develops no argument supporting her claim that the marital home or any real estate at issue became marital property. Husband purchased the real estate before he married Wife. Barring any other evidence, the real estate thus meets the statutory definition of "[a]ll real and personal property owned by a spouse before marriage…." Tenn. Code Ann. § 36-4-121(b)(2)(A). Wife's cursory assertion of an interest in the real estate fails to render it marital. We find no reversible error on this point.

Wife argues next that the Trial Court erred in finding that all of the farm equipment was premarital property. Wife points out that, according to Husband's proposed property

---

[2] In the section of his brief addressing Wife's issue concerning the Trial Court's classification, valuation, and distribution of property, Husband attempts to raise an issue about his being assigned a $15,585 Verizon debt. However, in his response to Wife's statement of the issues, Husband stated that "[t]he Trial Court did not err in its classification, valuation and division of the parties' marital property…." Also, Husband did not identify the Trial Court's assignment to him of the Verizon bill as a separate issue in his response to Wife's statement of the issues. Consequently, we find this would-be issue waived.

division, he bought at least $33,420 in farm equipment after the parties were married. The Trial Court nevertheless found that the farm equipment was premarital, or nonmarital, property and awarded it to Husband. Wife argues that the Trial Court should have classified the farm equipment purchased by Husband after the parties were married as marital property, valued it, and awarded her 50% of it. In response, Husband points to his trial testimony whereby he stated that his farm equipment was encumbered by a HELOC loan to the full extent of its value. Husband testified:

> Q: Anything else?
> A: Well I know we've talked about some of the things that was put into the HELOC but most of the debt paid down on the HELOC, first of all she's got down here as an asset was a combine and it was taken out of the HELOC, which is still owed on and...
> HON. CHANCELLOR DOUGLAS JENKINS: Well let me ask you a question, are you saying that to suggest to me that it's just a wash?
> A: Yes.
> HON. CHANCELLOR DOUGLAS JENKINS: You may have a corn-picker but you've...
> A: I still owe on it.
> HON. CHANCELLOR DOUGLAS JENKINS: ...got a debt that's equal to the value of it?
> A: Yes.
> HON. CHANCELLOR DOUGLAS JENKINS: Is that what you're saying?
> A: Right.

The Trial Court implicitly credited Husband's testimony that the farm equipment was encumbered up to its full value. There was nothing to distribute. It was, as Husband acknowledged, "a wash." If the Trial Court erred by classifying the farm equipment as premarital or nonmarital, such error was harmless as it did not affect the ultimate outcome of the case. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

Continuing our review of Wife's sub-arguments, Wife disputes the value that the Trial Court placed on the cattle. Husband testified to having 220 head of cattle at $750 per head. Husband acknowledged having one cow worth $30,000 and another one worth $8,000. Wife points to an exhibit prepared by Husband showing $295,000 in gross cattle equity as of the time of the divorce hearing and a net equity of $225,000. Husband, for his part, states that he accepts the Trial Court's valuation of the cattle. Wife's testimony on

-26-

this, as well as the valuation of property in general, was less than clarifying.  At trial, Wife testified:

Q: In other words, you don't have your own independent basis only what you've been able to get from the internet?
A: Correct.
Q: And so the basis of what we had used is what Larry had provided to us?
A: (Witness paused) Yes, but I mean, I knew of when he went to those cow sales.  I mean, the boys went with him to one of the first ones in Georgia.
Q: So how much do you think that he has in cattle?
A: I don't...I don't know.  I mean, he told me when he got into it he said, "Nobody knows, but I'm going big and I ain't kidding."
Q: Okay.  But what you want is to be awarded just half the interest in the cattle or half the cattle?
A: I mean, I just...(witness paused)...I mean, it doesn't really matter, I mean...(witness paused)...
Mr. Stambaugh [Wife's trial counsel]: I understand that you're saying that because you're tired and it's long in the day but it does matter.  And it does matter to this Court record and it does matter to this Judge.  I'm not trying to be harsh to my own client but I'm just telling you that it does matter.
A: (Witness paused) I mean, yes.
Q: And there's some other personal property that's listed in there as well?
A: (Witness nodding affirmatively)
Q: And as to some farm equipment that he's purchased since that time period and are you asking for an interest in that?
A: Yes.
Q: And you've marked all that down with values on your sheets and it shows how much the value is if it's split between the two Parties and you've totaled it up at the bottom of the sheet?
Mr. Beier [Husband's trial counsel]: I want to know before she answers that, what is the foundation, the basis for her evaluation?
Q: Did you take them off of Larry's sheet that he provided to us?
A: Yes.
Q: What he said the values were?
A: They're listed in there.  I mean, they're in the balance sheets.
Mr. Beier: What is the increase in the value?
A: I don't...I don't know.
Q: All you know is what you got from his tax returns and from the information...
A: From the...
Q: ...that he provided to us in Discovery?

-27-

A: Yes.
Q: You don't have any other information other than that?
A: Correct.
Q: Okay. And there's no other way to get access to those cattle for us to actually do an appraisal?
A: I mean, you would have to pull it up on your own account.

Meanwhile, it was and is Husband's contention that he actually lost money on the cattle over the course of the marriage. The Trial Court arrived at a figure for the cattle's worth within the range of evidence presented to it. The evidence does not preponderate against the Trial Court's findings regarding the cattle, and we find no reversible error in the Trial Court's classification or valuation of same.

As to the distribution of the marital estate, Wife argues that the Trial Court wrongly awarded Husband $9,700, a figure previously awarded to her. In response, Husband points out that $9,700 was awarded to him by the Trial Court as a credit to compensate for funds Wife had taken from him. In addition, Wife argues that the Trial Court erred in failing to distribute the increased value of Husband's clinic. She states: "The record in this case is clear that Wife's efforts contributed to the value of the Husband's vet clinic during the marriage." However, Wife's statement is conclusory and fails to point to any evidence of an increase in the clinic's value over the course of the marriage such that could be distributed. We discern no reversible error in the Trial Court's decisions regarding either the $9,700 or the alleged increase in value of Husband's clinic.

The remaining sub-argument made by Wife under the umbrella of this issue concerns her 401(k). Wife contends that the Trial Court wrongly classified her entire 401(k) balance as marital property rather than just the $127,000 increase in its value over the course of the marriage, or at least was highly unclear about whether it did or did not make such a distinction.[3] In his brief, Husband concedes that the marital increase in Wife's 401(k) was $127,000. However, he says that "[t]he Trial Court did not find that all of Wife's 401(k) is marital property as Wife contends, and she cites no proof and no finding by the [T]rial Court that supports their argument." This statement by Husband is inaccurate. The Trial Court specifically found: "Now with respect to the Parties' retirement assets, the Wife's 401K was two hundred and fifty-nine thousand dollars ($259,000.00), give or take a little at the time of the divorce. I found that that was all marital because I think that that's in keeping with the proof that I heard. And so that's an asset that has to be divided." In its order, the Trial Court plainly counted as marital property and awarded to Wife the full $259,000 balance of her 401(k) rather than just the $127,000 increase as

_____

[3] Wife argues cursorily that the Trial Court erred in valuing the marital portion of Husband's 401(k) at $43,000, but never develops this argument. We find no reversible error by the Trial Court on this point.

agreed to by the parties at trial and on appeal. The Trial Court thus did not distinguish between the premarital portion of Wife's 401(k) and the marital portion. The result is significant. Instead of awarding $267,885 to Wife and $183,000 to Husband, the effect of the Trial Court's inclusion of the premarital portion of Wife's 401(k) was to make Wife's effective share of the marital estate only $135,885 under the figures used by the Trial Court. This outcome is not consistent with the Trial Court's clearly stated intent to award her more than 50% of the marital estate.

Elsewhere, Wife argues that the Trial Court erred in its application of the statutory factors. She even suggests that, given the disparity between the parties, she should have been awarded the entire marital estate. We disagree. As reflected in its order, the Trial Court carefully considered each factor under Tenn. Code Ann. § 36-4-121(c). Contrary to Wife's insistence, we conclude that the Trial Court did consider Husband's wealth in its analysis. The Trial Court intended and attempted to award more than half of the marital estate to Wife. The Trial Court also observed that Wife is a professional person herself and is capable of earning a good income. The evidence does not preponderate against the Trial Court's factual findings except as to the Trial Court's finding concerning the marital portion of Wife's 401(k). Nevertheless, as it stands, the Trial Court's written order does not match its clearly expressed intent. In its oral ruling, which was incorporated into its final judgment, the Trial Court stated: "But this settlement I'm calling a wash. Technically the Wife owes the Husband about thirty...or somewhere between thirty ($30,000.00) and fifty thousand dollars ($50,000.00). And I'm saying that she doesn't have to pay it. I'm saying that this is a wash. She doesn't have to pay that. I am favoring her in this settlement probably as much as sixty/forty (60/40) and frankly it could be a little bit more." The Trial Court stated further: "And I think I said several times the thing that clinched it for me that I needed to favor the Wife was Husband's wealth, assets and earning capacity are somewhat greater than the Wife's. So the Court believes what It did is fair and equitable to both Parties."

To correct the discrepancy between the Trial Court's clearly stated intent and the mathematical result of its written order, remand is an option. In fact, Wife argues that the proof should be re-opened as to the division of property. We disagree with Wife, however. The record in this case has been developed extensively. This case has been appealed and remanded once before already. There is another option, one which comports with judicial economy and provides the parties a chance to move on with their lives. While we may not substitute our judgment for that of a trial court concerning the division of property in a divorce case, we do have the authority to correct clear mathematical errors. *See Ramsey v. Ramsey*, No. E2012-01940-COA-R3-CV, 2013 WL 5827648, at *6 (Tenn. Ct. App. Oct. 29, 2013), *no appl. perm. appeal filed* ("We determine that the trial court committed a mathematical error in subtracting the full settlement amount when the court's intent was clearly to divide the assets equally between the parties."). The Trial Court's use of

$259,000 rather than the agreed upon $127,000 resulted in a mathematical error by using the wrong number. In the present case, the Trial Court clearly intended to award more than half of the marital estate to Wife. To effectuate the Trial Court's clear intent, we modify the Trial Court's judgment to reduce Husband's share of the marital estate by $30,000— out of his $100,000 award of the appreciation of the marital home—and increase Wife's share of the marital estate by the same amount, $30,000. Based upon the Trial Court's findings as to the marital estate, and accounting for the marital portion of Wife's 401(k) being $127,000 rather than $259,000 as conceded by Husband, this $30,000 shift leaves Wife with some $165,885 of the marital estate to Husband's $153,000. This is in keeping with the Trial Court's clearly stated intent to award Wife more than half of the marital estate or "probably as much as sixty/forty (60/40) and frankly it could be a little bit more."[4]

We reiterate that we are not substituting our judgment for that of the Trial Court or tinkering with the Trial Court's decision. On the contrary, the Trial Court's judgment was well-reasoned and applied all of the statutory factors in keeping with our instructions on remand from *Mangum* I. The Trial Court neither applied an incorrect legal standard, reached an illogical or unreasonable decision, nor based its decision on a clearly erroneous assessment of the evidence. In short, the Trial Court did not abuse its discretion. Apart from our modification of the Trial Court's judgment to correct what we believe to be a mathematical error so as to effectuate its clearly stated intent as discussed above, we otherwise affirm the Trial Court in its classification, valuation, and distribution of the marital estate.

We next address whether Wife is entitled to an award of attorney's fees and litigation expenses on appeal. Wife notes her economic disadvantage relative to Husband. The decision to grant an award of attorney's fees on appeal "is within this Court's sole discretion." *Sample v. Sample*, 605 S.W.3d 629, 640 (Tenn. Ct. App. 2018) (citing *Cain-Swope v. Swope*, 523 S.W.3d 79, 101 (Tenn. Ct. App. 2016)). In arriving at our decision, we consider "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal … and any other equitable factor that need be considered." *Id*. (Internal quotation marks and citations omitted). In the exercise of our discretion, and in consideration of all equitable factors, we decline to award Wife her attorney's fees and litigation expenses on appeal.

The final issue we address is Husband's issue of whether this appeal is frivolous. Tenn. Code Ann. § 27-1-122 provides as follows:

---

[4] This is so even adding in the $30,000 to $50,000 the Trial Court found that "[t]echnically the Wife owes the Husband…" that the Trial Court did not require her to pay.

When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

A successful party should not be forced to bear the costs and vexation of a baseless appeal, nor should appellate courts be saddled with such appeals. *See Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 342 (Tenn. 2010). However, the courts must take care not to discourage legitimate appeals and should only impose a penalty pursuant to Tenn. Code Ann. § 27-1-122 in rare and obvious cases of frivolity. *Id.* Whether to award damages due to a frivolous appeal is a discretionary decision by the appellate court. *Young v. Barrow*, 130 S.W.3d 59, 66-67 (Tenn. Ct. App. 2003). Wife's appeal was not devoid of merit. Indeed, her appeal was partially successful. We deny Husband's request for attorney's fees on appeal.

## Conclusion

We modify the Trial Court's judgment to reduce Husband's share of the marital estate by $30,000 and increase Wife's share by the same amount. We otherwise affirm the Trial Court. The judgment of the Trial Court is thus affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the Appellant, Laney Celeste Mangum, and her surety, if any, and one-half against the Appellee, Larry Mark Mangum.

_____
D. MICHAEL SWINEY, CHIEF JUDGE